HOOD, Judge
(dissenting).
I cannot agree with the majority in its interpretation of the remand order of the Supreme Court or in its conclusions as to the facts which have been established.
In assigning reasons for remanding the case, the Supreme Court stated that it was unable to determine from the evidence “that an infusion of new capital into the partnership occurred during the second inar- *793 riage of Edese Hollier,” and that it could not determine “whether the successive partnership interests were merely ‘transformations’ of the previously existing interest or whether Edese Hollier infused community funds into the partnerships during his second marriage.” The language used indicates to me that the court intended to inquire into all of the new partnership arrangements which were entered into after the decedent’s second marriage. It is true, as pointed out by the majority, that the court mentioned specifically the 1953 partnership agreement, but I feel that this was cited merely as one glaring instance where clarification was needed. I did not interpret that reference to mean, as my colleagues apparently did, that the sole issue to be determined on the remand is whether Edese Hollier paid to the partnership which was formed in 1953 the sum of $13,000.00, in cash, from community funds which he had maintained separately from other funds (also belonging to the community) which had accrued to him as his portion of the profits of the partnership business. I think the case was remanded for evidence which would throw light on all of the partnership arrangements or agreements which were entered into by Edese Hollier after his second marriage, in 1936.
Upon remand of the case, the only evidence presented was the testimony of Phillip Hollier, the manager of F. Hollier & Sons, and the following documents: (1) Ledger sheets which purport to show the ownership and value of the “stock” in the partnership from and after January 1, 1947; (2) office copies of income tax returns of F. Hollier & Sons for the years 1936 to 1960, the originals of which purportedly were filed by that concern; and (3) a profit and loss statement of F. Hollier & Sons for the year 1961.
Phillip Hollier stated that he was unable to find any books or records of the partnership, other than office copies of its income tax returns, which purported to show the financial condition or ownership of the partnership prior to January 1, 1947. The community between the decedent and his second wife, of course, had been in existence for more than ten years before that date. The books or records which the witness was able to find consisted of two separate ledger books which purport to show the ownership of the “stock” in this unincorporated partnership. Photocopies of all of the pertinent pages of these two ledger books were filed in evidence. One set of these records shows the interests of the partners as of January 1, 1947, with a few entries purportedly being made on later dates extending to but not after 1953. The second set of ledger sheets, on forms entirely different from the first set, purports to show the interest of each partner as of January 1, 1953. Each sheet contains only one entry, showing the percentage of ownership and the value of the interest of one partner in the business as of that date. On two of the sheets in this last ledger, there appears a notation in the upper right corner bearing the date 1963, and showing a change in percentage of ownership, but no such change or explanation is made in the regular columns of the sheet. Also, I note that in the second set of ledger sheets the “James Hollier Estate” is listed as owning a 15 per cent interest in the partnership on January 1, 1953. The record shows that James Hollier died in 1957. These ledger sheets throw very little light on the nature of the partnership transactions, but I think they do indicate that a new partnership was formed in 1947, and that another and entirely different partnership, with new records, was formed in 1953.
The income tax returns which were introduced in evidence reflect that the interest which Edese Hollier owned in the business known as F. Hollier & Sons varied from time to time, just as we noted in our original opinion (158 So.2d 351). These returns also show, however, that the partnership earned a substantial profit each year, and that during several of those years the portion of the profits which accrued to Edese Hollier, and which belonged to the community, was in excess of $10,000.00 per *794 year. Also, in the income tax returns of the partnership, all of the net profits of the partnership were reported each year as personal income of the partners, and the exact portion of those profits accruing to each partner was shown. We must presume, therefore, that each partner reported and paid income taxes on 100 per cent of the net profits which accrued to him, although he actually may have withdrawn only 75 per cent of them.
Phillip Hollier confirmed the fact that 25 per cent of the net profits which accrued to Edese Hollier, and which became a part of the community existing between him and his second wife, were not withdrawn by the decedent, but were put back into the general fund of the partnership to be used in operating the business. He further testified that, over and above that 25 per cent, Edese Hollier also permitted the partnership to retain additional amounts from his 75 per cent of the net profits, and that the partnership used these additional sums contributed by the decedent in operating the partnership business. His testimony, in part, is as follows:
“Q. And, of course, I know that he could take them out at any time he wanted, but you must admit that if he didn’t want to take them out, which often he didn’t, that they were used by the partnership for re-investment to buy new merchandise, to pay salaries and for anything else the partnership required?
* * * * * *
A. Yes, they used it.
Q. So, actually, Philip, as a practical matter, those profits that Mr. Edese derrived (sic), certainly between 1947 and 1961, and probably before that, were mixed with the funds at the F. Hollier & Sons and were used for the business, isn’t that right?
******
A. Well, the money was still in the checking account of the store, I guess you’d say that it was mixed because you can’t take it out before you write a check for it.”
The statement of profit and loss for the year 1961 shows that during that year the partnership had a net profit of $12,618.26, but that the partners had withdrawn a little less than 50 per cent of that amount, indicating that some of the other partners besides the decedent also were re-investing their own funds in the business. Phillip Hollier testified that Edese Hollier “loaned” money to the store on one occasion, and that this loan was not repaid until after his death. He also stated that at the time of the last trial there was still some money in the partnership which belonged to the decedent, constituting portions of the net profits which were due and payable to Edese Hol-lier, but which had never been withdrawn by him. And, Items 10-A and 10-B of the inventory filed herein show that prior to his death Edese Plollier had left a total of $25,194.03, from what I consider to be community funds, in the partnership to be used in operating the business.
In my opinion, the evidence produced on the remand establishes clearly that funds belonging to the community which existed between Edese Hollier and Mrs. Dea Aucoin Hollier were regularly infused into the partnership business from and after 1936. Even if it should be held that no new partnership was created after the second marriage of Edese Hollier, therefore, there has been such a co-mingling of community and separate funds that it would be impossible to determine what part of the decedent’s interest in the partnership belonged to the community and what part belonged to his separate estate.
I think there are several other sound reasons why the decedent’s interest in this partnership must be decreed to constitute a part of the community. Some of these reasons are set out in our original opinion, and they will not be discussed here. My colleagues feel that the Supreme Court has rejected all of those other grounds, but I do not interpret the remand order as hav *795 ing that effect. As I appreciate that decision, the Supreme Court felt that the interests of justice required that additional evidence he obtained before any of the issues presented should be determined, and that it intended that all of the grounds urged and all of the issues presented should be considered after this additional evidence has been received.
For these reasons, I respectfully dissent from the judgment which has been rendered by my conscientious brothers who constitute the majority.
On Application for Rehearing.
En Banc. Rehearing denied.
HOOD and CULPEPPER, JJ., are of the opinion that a rehearing should be granted.